Jones, Chief Judge,
dissenting:
To deny recovery in this case is unthinkable. Such action would directly violate the Fifth Amendment in two respects. It would deprive plaintiff of' property without due process of law, and it would involve the taking of private property without just compensation.
That can’t be done against an individual, much less against a State.
The defendant admits that neither the State, county, nor any of their officers or agents were made parties to the proceeding. How can they be bound ?
*436 The defendant says that some of the State or county officers knew about the proceeding. Are we to have citation by rumor or by the uncertain word of the village gossip ? There are some of the forms of procedure that are vital and cannot be supplied by the conflicts and uncertainties of oral testimony.
These taxes were a first lien on the land. As was stated in Monroe v. Doe, 7 Ohio 262, 265:
* * * The state has a lien upon all land not exempt from taxation, which is calculated to be perpetual and which cannot be affected by any sale or transfer * * *. It can be removed in no other way than by payment of all taxes, penalties and interest due on the land.
In volume 24 of the original edition of Ohio Jurisprudence, at p. 100, is found the following language:
It is a'fundamental proposition that persons having rights in land cannot be affected by a judgment or decree taking such land unless they are parties to the proceedings. . [Citing Meyers, Fall & Collins, et al. v. Hewitt, 16 Ohio 449.]
As in practically all States, a tax lien is a first lien and is superior to all other liens.
We quote from 2 lewis eminent domain § 524 (3d Ed., 1909):
In Nebraska it has been held that a tax lien in favor of the State was not divested by a condemnation for railroad purposes * * * lien holders are owners within the statute and * * * must be made parties and * * * to divest their interest. [Citing State v. Mo. Pac. Ry. Co., 75 Neb. 4, 105 N. W. 983.] * * * In any case the lien would undoubtedly follow the fund and could be enforced against the fund * * *. [Citing In re Sleeper, 62 N. J. Eq. 67, 49 Atl. 549.]
We quote from section 538 of the same authority :
If a necessary party is omitted, the proceedings will be nugatory as to such party. But as a general rule such an omission does not vitiate the proceedings as to those who areparties, nor can the latter complain of such omission. [Citing cases.]
The author then states the general principles gleaned from a review of a great many eminent domain cases. These in- *437 elude, inter alia, that the Fifth Amendment should be liberally construed for the protection of private rights; that the word property includes every valuable interest which a person can have in or appurtenant to land; and that due process of law requires that the owner of any such right or interest should have a reasonable opportunity to be heard on the question of compensation before he can be deprived thereof for public use.
It has been held that payment to one other than the person entitled thereto is not a defense. Palo v. Rogers, 116 Conn. 601, 165 Atl. 803 (1933).
The courts have uniformly held that where property is subject to a tax lien, the payment of compensation money into the registry of the court does not extinguish the tax lien, but the lien is merely transferred from the land to the fund. Board of Capitol Managers v. Brasie, 72 Colo. 153, 210 Pac. 63 (1922); Ross v. Kendall, 183 Mo. 338, 81 S. W. 1107 (1904); Carpenter v. City of New York, 44 App. Div. 230, 60 N. Y. Supp. 633 (1899).
We quote from the Brasie case, supra, the following:
The money in the registry of the court stood in the place of the land, and the court below fell into error in not so holding. So much of the funds in the hands of the clerk as may be necessary should be applied to the payment of the special improvement tax, with accrued interest thereon, and the remainder, if any, should be paid to the respondent.
To hold that the statute of limitations should deprive a ■sovereign State of a just claim, in the circumstances of this -case, would be little less than tragic. A. F. O’Neil, Special Assistant United States Attorney, testified that he had paid millions of dollars to the county authorities, on other parcels •of land and in other cases, and in no case was the county made a formal defendant. This procedure, therefore, was the customary and established way of handling such matters between county and Federal authorities. The tax lien, being a first lien, always followed the proceeds and became a lien on any fund that might be paid into court by way of •-•compensation.
*438 Witnesses on both sides in this case testified that in this-particular county it often happens in Federal and State condemnation cases that the county is not made a party defendant, but is paid off by orders of distribution after notification that the time is ripe for presentation of tax bills. In Corpus Juris Secundum the following language appears:
It is well settled, however, that where there are liens-on the land taken or injured, the court may allow the condemnor to pay the award into court for the benefit of the owner and the lienholders, although the lienhold-ers were not made parties to the condemnation proceedings. 29 C. J. S., Eminent Domain § 200. [Emphasis-supplied.]
The first overt act by the Government which gave any indication that the Federal Government intended to refuse to recognize the validity of the tax liens was when the orders of distribution were entered on April 8,1948. Prior to that date the county had been repeatedly assured by letter of the Special Assistant United States Attorney in charge of the condemnation proceedings, Mr. O’Neil, that the taxes would be paid out of any funds arising out of a jury or court verdict entered on final trial and disposition of the case. The funds were distributed without regard to the valid existing tax liens, and without provision for their payment. Again the county officials were not notified and the rights of the plaintiff were completely ignored. “Upon what meat doth this-our Caesar feed, that he is grown so great” as to be able to¡ ignore the established rights of a subdivision of a sovereign State ? One is reminded of the story of the cannibal who is said to have claimed title to a piece of land on the ground that he ate the owner.
Up to that good hour there was no occasion for suit to be filed. The State and county could not file foreclosure proceedings. It had apparently been the usual custom to pay the taxes as a recognized first lien out of the proceeds of compensation.
The suit was filed in this court April 13, 1953, well within the six-year statutory period.
*439 In spite of the declaration of taking and physical possession, the process of taking was not complete until April 8, 1948, when .the funds were actually diverted from their proper channels and the repudiation of the obligation was finally declared. In any event, limitation could not possibly begin to run before February 16, 1948, when final judgment was entered. Until that time condemnation proceedings were still pending and the act of legal taking had not been completed.
The declaration of intention to take the fee simple title to property, plus the actual taking of physical possession, are not sufficient to transfer title. The Constitution says “nor shall private property be taken for public use, without just compensation.” Certainly final action by the court in the condemnation proceeding which had been filed was necessary before legal title passed.
The money was paid out to the former owners under an ambiguous agreement that apparently led such owners to believe that they were being paid these amounts for their equity. At the time these ambiguous agreements were made the Federal officials were fully aware of the fact that the sums that they were agreeing upon and paying were insufficient to cover the tax liens. In spite of all this, the money was paid out without a word being said to the plaintiff, who held a first lien on the fund. Whatever else may be justified, the defendant would be liable for such of the valid unpaid taxes that were in effect at the time the declaration of taking of the land was first made, to the extent at least that the funds unjustly distributed would have been sufficient to absorb such taxes.
The facts shine through this whole record that the Federal officials apparently feared to let the rate of compensation as to this suburban property be fixed at a regular trial and deliberately settled with the equity owners for the purpose of leaving the plaintiff without any enforceable rights.
I would hold that plaintiff’s cause of action first accrued on April 8, 1948, when plaintiff’s first lien claim was first repudiated.
And in the alternative, I would certainly hold that the act of paying out the settlement funds, on which plaintiff held *440 a first lien, created a new cause of action to tlie extent that such settlement funds were sufficient to pay such taxes.
Whatever may be claimed as to any action or lack of action on the part of plaintiff, there was a cause of action that accrued when, with full knowledge of plaintiff’s rights in and lien on the compensation fund, the Federal officials paid out such funds without any notice to plaintiff. This, to the extent of such funds, certainly was a taking of plaintiff’s rights in the property. Up to the time of the distribution of the award moneys to the former owners the county’s rights were fully alive and unimpaired in the condemnation case.
I would allow plaintiff to recover the amount of taxes with interest from April 8,1948.